UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK
------------------------------------------------------------------
In re                                                                OPINION AND ORDER

        CAMERON M. WEINGARTNER                             Case No. 04-18954 K

                                Debtor
------------------------------------------------------------------


        This Chapter 7 case involves a tax refund that was not disclosed in the Debtor's

schedules. Some unscheduled assets involve wrongdoing by a debtor or error by the debtor's

attorney, while other unscheduled assets are of completely innocent circumstances.  A common

illustration of the latter is found in cases in which a debtor was not aware that he or she had a

remote interest in the home of a parent until the parent's home goes up for sale or refinancing.

Another might be where the debtor had no idea that he or she was named in someone's will.  In

the case currently at bar, we do not yet know why the Debtor failed to schedule a substantial

(over $5,000) tax refund.  By way of proffer, his attorney explains that when the petition was

filed on December 18, 2004, it was not clear to the Debtor whether he would have a tax refund,

because he and his ex-spouse go back and forth each year over who will claim their child (or

children) as a deduction.

        In examining the Official Form for "Schedule B" we find that line 17 requires

listing of "Other liquidated debts owing debtor include [sic] tax refunds.  Give particulars."

Certainly reliance upon the word "liquidated" would not be a mere quibble.  However, when this

Debtor claimed the "cash exemption" under N.Y. Debtor and Creditor Law § 283(2) he did not

do so as to any possible tax refund; rather he did so as to "Cash on hand" consisting of  "Pocket

money" of $20.00.

By the time he was examined by the Trustee on January 13, 2005, he acknowledged the possibility of a significant tax refund, and the Trustee set about collecting it. The Trustee adjourned the meeting of creditors to February 10, and applied to retain himself as attorney for the estate, and he obtained an Order thereupon. The Debtor did not appear at the adjourned meeting on February 10, 2005, and the Trustee continued the meeting to March 10, 2005. The Debtor did not appear at that meeting either. (The record is silent as to why the Debtor did not appear; the Court presumes that the Trustee waived the appearance in light of the fact that the Debtor did complete and file the tax return.) The Trustee did not object to the Debtor's discharge, and so the Debtor was discharged on March 17, 2005. The Trustee made a Motion on April 4, 2005 seeking an Order directing turnover of $5,514.98 of a total tax refund of $5,902, the reduced amount being the result of pro-rating the tax refund for the whole year, as of the date of the filing of the petition on December 18, 2004.

On April 5, 2005 the Debtor filed an amendment to his case here to add the tax refund at item 17 of Schedule B and to claim the refund "exempt" in Schedule C. On April 6, his attorney wrote a letter to the Court objecting to the Trustee's motion, taking issue with the fact that the Trustee had not credited the Debtor with the $2500 cash exemption, and offering to consent to a turnover order in the amount of $3,015. On April 11, the Trustee filed an objection to the amended claim of exemption, asserting, *inter alia*, that "the claim of exemption in the tax refund is inappropriate as said property was neither listed nor scheduled by Debtor, but was discovered as an undisclosed asset by the Trustee; . . . [and] the claim of exemption in the tax refund is inappropriate as said exemption was asserted only after a turnover motion was filed

with the Bankruptcy Court and served upon the Debtor and counsel . . ."

Both the turnover Motion and the Trustee's objection to the amended claim of exemption came before the Court on April 21, 2005 at the Court's monthly Niagara Falls session.

As noted above, we do not yet know whether an evidentiary hearing would support or would belie the Debtor's proffer to the effect that he did not know whether he would be receiving a tax refund for the year 2004 as of the time his schedules and statements were filed on his behalf on December 18, 2004. Nonetheless, there can be no doubt about the fact that the Trustee has expended a significant amount of time and effort - presumably at the expense of the estate, and therefore at the expense of the Debtor's creditors - simply to get to the point at which he can hope to obtain, and preserve the creditors' right to, no less than $3,015. And as a fiduciary, he must demand more under the facts of this case as he understands the facts to be.[1]

The Court finds that here, as in many other circumstances upon which the Court has commented over the course of many years, it is inappropriate to reach the question of the Debtor's entitlement to a claim of exemption until after the Court rules upon the Trustee's Motion for an order directing turnover. Consider, for example, this Court's unpublished decision in the case of *Viola Ruggiero*, 98-11089, on August 23, 2000. That case was a Chapter 13 case. During the course of performance of the Chapter 13 Plan, the Debtor received a $34,000 "lump sum pension" (so-called) by virtue of having become "permanently disabled" under certain

---

[1]Under other circumstances, this Trustee and other trustees will frequently concede even a somewhat late exemption amendment; but not where the estate is going to have to absorb attorneys fees that should not have been made necessary by a debtor's legal gymnastics.

provisions of a collective bargaining agreement that caused a provision thereof to "kick in" to

supplement what she had been receiving from Social Security Disability.  She spent the $34,000

before the Chapter 13 Trustee knew about her receipt of the money.  After the Trustee demanded

the money, that Debtor sought a ruling as to whether the money was exempt as "pension"

monies.  This writer said:

> What is to be done about a Chapter 13 Debtor who receives $34,000 in
> funds and spends them wildly (for example a $7,000 'gift' to her companion)
> before she is 'caught'?  Is there anything in the Code that makes this behavior
> 'wrong,' and does the Debtor's state of mind make any difference?

> . . . We must ask how we treat those similarly situated who do <u>not</u>
> squander the money.  What we say to those people, at the very least, is to turn the
> money over voluntarily toward the satisfaction of your confirmed Chapter 13
> plan.  This may or may not result in substantial surplus remaining for a debtor to
> spend as she wishes.  But if we did not know about the debtor's right to this
> payment and if the percentage to creditors should be raised as a result . . . that too
> would be done, resulting in completion of a plan that pays a higher amount to
> creditors than had originally been confirmed.

> It is, perhaps, conceivable that a debtor who 'spends first and asks
> questions later' should fare no <u>worse</u> than one who asks before spending.  This
> might happen where the debtor had a completely non-culpable state of mind.  But
> it is not conceivable that under any circumstances the one who spends first and
> asks later should be treated <u>better</u> than the Chapter 13 debtor who does not
> presume to make her own decisions as to what is right and wrong regarding the
> expenditure of the funds.

> It may be that there ultimately might properly be presented to this Court
> the question of whether those funds were or were not exempt funds.  But this is
> not the proper time.  This Debtor may not be permitted to jump to the same status
> as a debtor who turns the funds over to her attorney or the Chapter 13 Trustee and
> asks the Court please to determine her rights.

> As to this Debtor, we need to know where the money went, every penney
> of it, with specificity.  Only then will all parties in interest know what the
> economic considerations are surrounding a decision to pursue or not to pursue the
> legal issues presented.  It does not suffice for the Debtor to say 'the money is

gone, so just decide the issue of law.'  If the money has been turned into other
valuable assets or is otherwise recoverable, then some of the legal issues
presented might warrant decision, but perhaps not others.

Regardless of where this inquiry ultimately leads, the first step is critical
to the restoring of the equitable balance between the actions of <u>this</u> Debtor, and
the fact that many debtors choose to ask the right questions as the right time.
[Emphasis added.  Footnote omitted.]

And so the Court directed that debtor to account for how she expended the

$34,000.  When that was completed, that trustee determined that there was little he would be

able successfully to pursue, and reached a settlement with the debtor, on notice to the debtor's

creditors, and the Court never had to decide the otherwise-far-reaching exemption issue.

A completely different context was presented in the case of *Ontario Orchards,*

Case No. 87-10255, addressed in this writer's decision of January 7, 1995.  That was a Chapter

12 case that was eight years old at that point.  The Chapter 12 Trustee moved to dismiss the plan

on the grounds that (per his allegations) he had received insufficient payments from that debtor

to execute the plan; the debtor had refused and failed to pay the final sum necessary to complete

the plan; the five year maximum length of the plan under Chapter 12 had been grossly exceeded;

and  the trustee's demands for information had been ignored by the debtor for many months.

The debtor did not explain or dispute any of the trustee's affirmations.  Instead,

the debtor asserted a right either to modify its Plan and thereby deem it to be "completed" so that

the debtor could receive a "completion discharge" under 11 U.S.C. § 1228(a), or to leave the

plan as it is but to receive a "hardship discharge" under 11 U.S.C. § 1228(b).

This writer stated the following:

The Debtor seems to think that grounds for dismissal somehow evaporate

if there are still some statutory provisions by which the Debtor may prevail upon the Court to grant the Debtor greater relief against its creditors. It is as if the Debtor believes that the possibility that the Court might approve a plan modification or might grant hardship discharge requires that the Court place the Trustee's dismissal motion on hold (obviating the need for the Debtor to respond to that motion) and take the Debtor's motion first.

In fact, the opposite is true. Because the Trustee's motion is well-founded on its face and none of its essential elements have been placed in dispute, it should be granted unless the Debtor completes the current plan immediately. The Court will not reach the Debtor's motion. . . . The case is dismissed unless the plan is completed within 30 days."

In that case the debtor found a way to make the final payment.

A bit less in-point, this Court has in many, many cases, on the record in open Court, denied requests to stay turnover orders while an appeal of the underlying exemption issue is pending in someone else's case. In that context the Court has often stated that to grant, in essence, a "stay pending someone else's appeal" grossly alters the economics of bankruptcy cases in the debtor's favor and against his or her creditors. It is only when a turnover order is enforced (in the absence of an appeal in that case), that a debtor is required (like any other litigant in a Federal Court) to decide whether to comply with the Order or to appeal and seek a "stay pending appeal." And the economics of that type of decision underlie nearly everything (in some way, shape or form) that occurs in a trial-level Federal Court. Settlement (or plea-bargaining), rather than trial and appeal, results far more often than not.

More recently, the Court was asked by a debtor to deny a turnover Motion and conduct a valuation hearing regarding a motor vehicle that had been claimed as exempt, even though the debtor conceded that the motor vehicle was likely not "entirely" exempt. In other words, the car seemed to be worth more than $2400 but the debtor did not wish to be denied the

use of the vehicle, and instead wished the Court to deny to that trustee the opportunity to conduct

a "valuation" by the best means available - to wit, by sale.  (That debtor did wish to make a bid

on the non-exempt equity in the vehicle, however much that would turn out to be after a

valuation hearing.)  In open court the undersigned ruled that what the debtor was seeking was to

short-circuit a clear right of the estate (§ 542 turnover) and instead to expand the privilege of

exemption to include not only the exemption itself, but also to include a right in the debtor to

possess both the exempt and non-exempt portion of the property until the trustee is able to satisfy

what would become a judge-created burden of proving how much is non-exempt, <u>without</u> the

opportunity to <u>sell</u> and with no assurance of payment to the trustee's appraiser or attorney.  The

Court denied the debtor's request.

   In the spirit of the above holdings, this Court today finds that the Trustee's

Motion for turnover must be heard first, and must be <u>granted,</u> <u>but without prejudice</u> to the

Debtor's ability to argue <u>later</u>, the availability of the $2500 cash exemption.  That latter question

may take us to an evidentiary hearing to determine the credibility of the Debtor's proffer and,

consequently, any "taint" upon the belated claim of exemption.  The Debtor might have to waive

attorney-client privilege.  But no substantive right of the Debtor would be lost otherwise,[2] and

the economic decision to proceed in that manner would not be borne solely by the Debtor's

creditors.  The Trustee's turnover motion is granted in the amount of $5,515, but the Trustee's

objection to the Debtor's belated claim of exemption is continued to the Niagara Falls calendar

---

[2]A litigant who asserts the attorney-client privilege does not automatically win; see Paul R. Rice, Attorney - Client Privilege in the United states, § 10:8 (2d ed. Thomson/West 2005) (discussing views that negative inference may be logically drawn when witness withholds evidence by asserting the privilege).

of **May 19, 2005 at 10:00 a.m. , at the Public Safety Courtroom, 520 Hyde Park Boulevard,**

**Niagara Falls, New York,** for status report.

        SO ORDERED.

Dated:       Buffalo, New York
              May 13, 2005


                                    s/Michael J. Kaplan

                            _____

                                      U.S.B.J.